1821.

DALE
v.
ROOSEVELT.

DALE and wife, executors of FULTON, *against*
N. I. ROOSEVELT.

Where F. was induced by the representations of R. that he had dis-
covered a valuable *Coal Mine*, on the Bank of the *Ohio River*, to
enter into, and contract for the purchase of a tract of land, stated by
R. to embrace the mine; and besides paying to R. 4400 dollars,
F. covenanted to pay him one thousand dollars annually, for twenty
years; but which annuity was to cease, if after the mine was
faithfully worked by R. it should not produce at least 12,000 chal-
drons, &c., and the land was accordingly conveyed by R. to F.
It appearing that there was, in fact, no coal mine within the
boundaries of the land conveyed, though there was coal adjoining
it, in the bed of the river, which was navigable, deep, and rapid;
but the working of the mine, if practicable, would be very hazardous,
expensive and unprofitable: the contract, on the part of F., was held to
be founded in mistake and misrepresentation; and R. was perpetually
enjoined from bringing any suit against F. to recover the annuity so
agreed to be paid by him.

*Feb.* 23, 1821.      THE plaintiffs, as executors of *Robert Fulton*, filed their
bill, the 18th of *November*, 1817, for relief against an
agreement entered into between the testator, in his life
time, and the defendant. The agreement, which was under
seal, was dated *September* 16th, 1813. It recited, that the
defendant had discovered a *coal mine* on the *bank* of the
river *Ohio*, in the *Indiana* Territory, some distance above
*Anderson's* creek, at which mine the steam boat, on her
first descent, took in coal for her fuel; that the coal mine
was embraced by certain land, particularly described;
which land, the defendant covenanted to convey, by letters
patent from the *United States*, to *F.* in fee; and *F.* cove-
nanted, on receiving the letters patent for the land, to pay
to the defendant, 4400 dollars, &c.; and, also, to pay to
the defendant, for the term of twenty years, from the 5th of
*June*, 1814, one thousand dollars, yearly, in quarterly pay-

ments. That *F.* should, in a convenient time after the 5th of *June*, 1814, commence working on the mine; and should the mine become exhausted, after faithfully and scientifically working the same, within the boundaries of the lands so described, and not so much coal be found as to produce *twelve thousand* chaldrons ; and should a question arise, within the *twenty* years, whether the land had been or could be made to produce that quantity, the matter should be decided by three persons, to be chosen in the mode provided in the agreement, and their decision should be final ; and the payment of the one thousand dollars a year to the defendant should cease, if the decision should be that the quantity of 12,000 chaldrons had not been, or could not be produced ; otherwise the annuity was to continue. The bill stated, that *F.* was induced to enter into this agreement solely from the representations of the defendant, which were false and deceptive. And that the defendant had brought a suit at law against the plaintiffs, as executors of *F.* on the agreement. The bill *prayed* for an injunction to stay the suit at law, and that the agreement might be decreed to be delivered up, to be cancelled ; and for general relief.

The defendant appeared, and filed his answer, the 23d of of *January*, 1819 ; and a replication having been filed, several witnesses were examined by the parties. The evidence taken in the cause is fully stated in the opinion delivered by the Court.

*Wells*, for the plaintiffs.

*D. B. Ogden*, for the defendant.

THE CHANCELLOR. The representatives of *Robert Fulton*, deceased, are sued at law, upon a covenant which he made with the defendant, to pay him an annuity of 1,000 dollars a year, for twenty years, to be computed from the 5th

1821.

DALE
v.
ROOSEVELT.

of *June*, 1814. The consideration for this covenant was the conveyance of 1,040 acres of land on the right bank of the river *Ohio*, in the now state of *Indiana*, stated to embrace " a certain coal mine, on the bank of the *Ohio* river, in the *Indiana* territory, some distance above where the creek, called *Anderson's* creek, empties into the *Ohio* river," and which coal mine the defendant " did discover." These words are taken from the contract set forth in the bill, and under the hand and seal of both parties ; and the great point in the case is, whether the contract was not founded upon representations made by the defendant to *Fulton*, which were not true in point of fact.

There can be no doubt, that the sole inducement, on the part of *Fulton*, in making the purchase, was to obtain the ownership of a mine of mineral coal. This is apparent from the contract itself, and from every document connected with it, and referred to in the pleadings.

The representations made by the defendant were in writing, and in answer to a letter of *Fulton*, and were made a few days before the execution of the contract, and those representations gave a very flattering account of the situation of the coal mine, of its productiveness, and of the facility with which it might be worked.

In that answer, the defendant stated " the quality of the coal to be *excellent ;* that the *first stratum* had not been worked to the bottom ; that when he first discovered the mine, after *removing a few inches of earth*, he did, with the aid of a hatchet and a few wooden wedges, break or split off *squares of coal* as large as two men could handle, and then threw in his boat *a few chaldrons*, procured in that way, and kept with it a constant fire all the way to *Natchez*. That when he arrived at *Natchez*, he sold what remained, say 30 or 40 bushels, for smiths' use. That on his second descent with the steam boat, he had, on arrival at the *coal bank*, no occasion to take any coal out of the mine, as he found, ready

raised, *within ten feet of where the steam boat came to, many thousands of bushels thrown up,* ready to be carried off by flats, some of which were then on the spot to load. That he took on board as much of the coal as he judged necessary; that during his residence at *New-Orleans,* he found *several flats loaded with coal for sale,* which came from the same mine; that the mine had been opened on, or near the centre of the line of the river; that the *coal, when the water is up, is overflowed,* as well as all the bottom land on the margin of the *Ohio ;* that by wheeling it a *few yards* out of the mine, it may be put upon high ground, accessible at all stages of the water."

These representations are contradicted by two witnesses, who have been examined on the part of the plaintiffs, and who prove that the mine is not on the bank of the river, and is not productive, and is almost incapable of being worked.

*James McDaniel, jun.* says, he knows the tract of land said to belong to the heirs of *Fulton,* and that he lives in *Perry* county, in the state of *Indiana,* and about five miles from the tract, and is a farmer of fifty years of age and upwards. That he is acquainted with the *Ohio* river, to the distance of forty miles above the mouth of *Anderson's* river, and that there is a coal mine four or five miles above the mouth of that river. That a bed of coal was discovered opposite the said tract of land, " in the bed of the river," and that coal has been raised from that bed, though he knows of no boats taking in coal there, except a small canoe, and he assisted in raising 8 or 10 bushels from that mine. That in some seasons, it is covered throughout the year with water, and is always covered, except in very low water. That the water of the *Ohio* rises from 35 to 40 feet, and the current is rapid, and the coal mine could not be worked, " but at a very great expense."

*John Bristow* says, he is upwards of thirty-three years of age, and is by occupation a carpenter, and resides at *Troy,* in *Perry* county aforesaid, and is acquainted with the tract

of land said to have been sold by the defendant to *Fulton.* That he is acquainted with the *Ohio,* for thirty miles up, from the mouth of *Anderson's* river, and that there is a coal bed, "in the bed of the *Ohio,*" four or five miles above the mouth of *Anderson's* creek. That it does not appear to be an extensive mine, and the place is covered with water, at least two-thirds of the year. That the water of the *Ohio* rises 30 feet and more, and the current is rapid, and the mine could not be worked, "but at very great expense." That the bed of coal is covered with slate rock, to the depth of six or seven feet. That he does not know of any steam boat, or other boat taking in coal at that place, except one keel boat, which was there loaded for sale. That he has assisted in raising coal from that mine.

The defendant examined three witnesses, in support of the truth and accuracy of his representations.

*Thomas C. White* says, he has been in the state of *Indiana,* upon the river *Ohio,* and rode on horseback from *Troy,* in that state, at the request of the defendant, to view the tract of land mentioned in the contract, though he had not seen the map or survey of the land, made by order of the government of the *United States.* He says, he passed over these tracts twice on horseback, and in crossing the land, he discovered a bed of mineral coal, on which several men were at work, digging up the coal, and it appeared to him to extend along the surface of the bank of the *Ohio,* for about 30 or 40 yards; and it was evident to him, "that the bed of coal was in its natural situation, and constituted a part of the land." That from the circumstance of there being "much coal in the neighbouring land," and from the appearance and extent of the bed of coal, he should suppose that it would yield a great quantity. That the bed of coal aforesaid was "on the bank of the river," and covered with water in the wet seasons, by the rise of the river. That when he saw it, the water was low, and the spot which he viewed could not be worked when the river was full; and it would

be necessary to sink a shaft on the bank above. That the Ohio is a public highway, and he does not know how high it rises.

*Elias Rector* is a postmaster at *St. Louis*, in the state of *Missouri*. He descended part of the *Ohio* river with the defendant, in 1809. He had, before that time, discovered that there was a quantity of mineral coal on the west side of the *Ohio*, in the state of *Indiana*, " some distance above" the mouth of *Anderson's* creek, and he went down the river for the purpose of showing the mineral coal to the defendant. He believes that there is a coal mine there, " as he has seen the coal in different places." He and the defendant, and others, took out of the mine some of the coal, for the purpose of trying it. He has seen coal " on that land, and on other tracts in the neighbourhood." The land he refers to " was just above the mouth of *Anderson's* creek." The coal was not found in the bed of the *Ohio*, and it was not a deposit, and he believes it to have been a mine of mineral coal; and the said coal mine, he believes, is not generaly covered with water, but he does not know the greatest height of the river, or the expense of working such a mine.

This is all the material testimony in the case, for I have not considered the testimony of *Latrobe* as having any bearing on the point, touching the truth and accuracy of the representations of the defendant, which were the inducement to the contract; and the examination of *Jacob Harvey* being after publication and the inspection of the testimony previously taken, was irregular.

The most precise, accurate, and authentic testimony on the subject is given by the two witnesses who reside in *Indiana*, near the land in question ; and they disprove completely the allegations contained in the defendant's letter to *Fulton*. The coal mine, which may be deemed appurtenent to the land conveyed to *Fulton*, is in the bed of the river *Ohio*, and could not have been conveyed to *Fulton*, for that river is a navigable water, a great national highway,

and does not belong to any individual. The representation was, that it was on the bank of the river, and the proof is, that it is in the bed of the river; this is a most material mistake or misrepresentation, and goes to the essence of the contract: nor could such a bed of coal be worked, but at enormous and ruinous expense, if the right of working it belonged to either of the parties. It is, for the most part of the year, under water, and the river rises from 30 to 40 feet, with a rapid current, which would probably defeat every effort to sink and maintain shafts on the spot. If the mine described by the two witnesses in *Indiana* be the mine intended, then the representation of the defendant was most essentially untrue. All his glowing descriptions of the fertility of the mine, and the facility of working it, are without proof. He states, that he procured some chaldrons of coal with the greatest ease, sufficient for constant use, in the voyage down to the *Natchez*, and to leave a surplus of 30 or 40 bushels; that at another time, he saw many thousands of bushels thrown up, and flats loading there, several of which had descended loaded to *New-Orleans*. It is impossible to reconcile this representation with that of the two witnesses who live in the neighbourhood, and who have both worked at the mine, in the bed of the river; and who state, that it never yielded beyond a very scanty supply, and is so covered with the waters of the river, that it never could be worked but at a very great expense.

Do the two witnesses, examined on the part of the defendant, restore truth or credit to his representations? If there had been colour for these assertions, it would seem that they must have been very susceptible of proof; for the matters to which they related were, from the nature of them, of great and general notoriety; yet we have but two witnesses, one a stranger in that country, or only a transient visiter, and the other does not appear to have been there since his visit with the defendant, in 1809; and

neither of them locate the land contained in the contract with any satisfactory precision. *T. C. White* rode over the tract on horseback, without having seen the map or survey of the land; and we are to presume the place is in a wild state without any definite boundaries. He discovered a bed of mineral coal, along the surface of the bank of the *Ohio*, and which would be covered with water in wet seasons, and he should judge it would yield a great quantity, from the appearance and extent of the bed, extending 30 or 40 yards, and from the circumstance of there being " much coal in the neighbouring land." This is a very lame and superficial account, and certainly leaves us in great doubt as to the identity of places. There is no resemblance to the spot described by the other two witnesses, and the neighbouring land he speaks of is understood to mean land not conveyed by the defendant. If there be much coal in the neighbouring land, it shows the necessity of a very precise location of places, and how easily mistakes may have been made by the two non-resident witnesses of the defendant.

*Elias Rector* speaks still more loosely. The land he refers to was "just above" the mouth of *Anderson's* creek; and he says, that before he went down the *Ohio* with the defendant, he had discovered coal " some distance above" *Anderson's* creek; and he believes there is a coal mine there, " as he has seen the coal in different places." It is worthy of notice, that he speaks very drily of his discovery, in company with the defendant, and only observes, that he and the defendant took some of the coal to try it; but he says nothing of slabs or squares of coal, and of loading the boat with chaldrons, and sufficient to have a superabundant quantity of 30 or 40 bushels, at the *Natchez*.

Upon the whole, I consider the representations made to *Fulton* as altogether fallacious, and that the consideration for the stipulation of such an extravagant annuity, did not

1821.

DALE
v.
ROOSEVELT.

exist in point of fact. Whether the defendant made the statements in his letter to *Fulton*, through mistake, or under the delusions of his own imagination, or by design, I am not able to say. It is sufficient for the decision of this case that the representations are not supported, but are contradicted by proof, and that the claim of the annuity upon such a state of the case is unconscientious and unjust.

The bill seeks to have the contract delivered up to be cancelled ; but it has been partly executed, as the land described in the contract has been conveyed, and part of the consideration paid. The want of a coal mine corresponding with the representations of the defendant, seems to have been intended by the parties to apply to the *annuity*, as there was a provision in the contract itself, that if the mine should not be competent to yield a stipulated quantity of coal, after faithfully and scientifically working the same " and within the boundaries of the land described," the annuity should cease. It has not been so worked by *Fulton*, or his representatives, and it might therefore, be alleged, that the experiment intended has not been made. The answer to that objection is, that there was no coal mine within the boundaries of the land conveyed, but it was adjoining to it, in the bed of the *Ohio* ; and this, if true in point of fact, (as I believe it to be) is a decisive answer to the objection. Another answer to it would be sufficient, if the mine was covered by the deed, and that is, that it would have been an idle, hopeless and ruinous project, to have attempted to work such a mine " scientifically, according to the plan and manner of working coal mines in *Europe*," in the middle of a mighty river, covering the spot most part of the year, and rising 40 feet, with a resistless current. It would be absurd to suppose, that *Fulton* was obliged to expend the whole amount of the accumulated annuity in the attempt, before he could be entitled to be discharged from the annuity. This would be making the end entirely subservient to the means.

It is sufficient, that in the judgment of reasonable men, who had examined the spot, *and had actually worked upon it,* the attempt would have been useless, or attended with very great expense and hazard.

I shall accordingly decree that the defendant be perpetually enjoined from suing or prosecuting any suit pending at law, for the recovery of the annuity, or any part thereof, and that he also pay to the plaintiffs the costs of this suit.

Decree accordingly